UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

GREAT AMERICAN INSURANCE
COMPANY,

            Plaintiff,

v.                                                    Case No. 6:16-cv-63-Orl-37KRS

BILLY J. BREWER; DEBORAH
BREWER; and BREWER PAVING &
DEVELOPMENT, INC.,

            Defendants.

_____

## ORDER

This matter is before the Court on the following: (1) Plaintiff's Motion for

Summary Judgment (Dispositive Motion) and Memorandum of Law in Support

(Doc. 62); (2) Defendants' Response to Plaintiff's Motion for Summary Judgment

(Dispositive Motion) and Memorandum of Law in Support (Doc. 69); and (3) Plaintiff's

Reply in Support of Motion for Summary Judgment Against the Defendants (Doc. 70).

### INTRODUCTION

Plaintiff Great American Insurance Company initiated this action against

Defendants Brewer Paving and Development, Inc. ("**BPDI**"), Billy J. Brewer and Deborah

Brewer to enforce its rights under an agreement of indemnity. (*See* Doc. 14; Doc. 15-1, pp.

1–9 ("**Indemnity Agreement**").) Although Defendants admit that they entered into the

Indemnity Agreement (Doc. 19, ¶ 8), and they "have failed and refused to indemnify

[Plaintiff] or to deposit collateral security as required under the Indemnity Agreement"

-1-

(*id.* ¶ 21), they also allege that Plaintiff's claims are "barred by the Doctrine of Bad Faith" ("**Bad Faith Defense**") (*id.* ¶¶ 30–33, 44–47, 53–56). Plaintiff now moves for summary judgment in its favor on its claims for breach of contact (Count II) and specific performance (Count I). (Doc. 62 ("**Motion**").) Defendants responded to the Motion (Doc. 69 ("**Response**")), and Plaintiff replied (Doc. 70 ("**Reply**")).

## Legal Standards

Under the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir. 2010). To meet this burden, the movant must: (1) cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or" (2) show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence" of a genuine dispute. Fed. R. Civ P. 56(c)(1).

If the movant meets its initial burden, then the Court must enter summary judgment unless the non-movant shows that a genuine issue of material fact remains for trial. *See Divine Motel Grp., LLC v. Rockhill Ins. Co.*, 655 F. App'x 779, 781 (11th Cir. 2016)(quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). What facts are "material"

depends on the substantive law applicable to the case.[1] *See id.*; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Hickson*, 357 F.3d at 1260. "An issue is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014).

In resolving motions for summary judgment, courts must not make credibility assessments or weigh conflicting evidence. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Rather, courts must: (1) view the record evidence in the light most favorable to the non-moving party; and (2) draw all reasonable inferences in favor of the non-moving party. *See White v. Pauly*, 137 S. Ct. 548, 550 (2017); *see infra* n.2. If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[1] Here, the parties do not dispute that Florida law governs in this diversity action. *See Tatum v. SFN Grp., Inc.*, No. 16-11966, 2017 WL 2705302, *3 (11th Cir. June 23, 2017) (noting that in diversity actions, federal courts "must apply the choice of law rules of the forum state"). In applying Florida law, the Court must endeavor to decide this action as would the Florida Supreme Court. *See U.S. Fid. & Guar. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008); *BRE Mariner Marco Town Ctr., LLC v. Zoom Tan, Inc.*, 682 F. App'x 744, 745–46 (11th Cir. 2017) (noting that federal courts must predict how the highest court would decide the case before it).

T<small>HE</small> F<small>ACTS</small>[2]

## I.      The Indemnity Agreement

Under the terms of the Indemnity Agreement, Defendants agreed to be liable for

losses and expenses incurred by Plaintiff because of its issuance of construction bonds to

Defendants or the Defendants' breach of the Indemnity Agreement:[3]

> The [Defendants] jointly, severally and/or collectively shall exonerate, indemnify, hold harmless, and keep [Plaintiff] indemnified from and against any and all liability for losses, costs, and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs, consultant or expert fees, and counsel fees) and from any against any and all such losses and/or expenses which the [Plaintiff] may sustain and incur:
>
> > (1)      By reason of having executed or procured the execution of Bonds on behalf of any of the [Defendants;]
> >
> > (2)      By reason of the failure of the [Defendants] to perform or comply with any of the covenants and conditions of this [Indemnity] Agreement[;] or
> >
> > (3)      In enforcing any of the terms, covenants, obligations, or conditions of this [Indemnity]

---

[2] The facts recited here and in more detail below are not the actual facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect the Defendants' "best case"—which is what the Court must consider at this stage of the proceedings. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see also Walker v. City of Riviera Beach*, 212 F. App'x 835, 837 (11th Cir. 2006).

[3] Generally, a contract for indemnity concerns a promisor's agreement to protect the indemnified party "against loss or damages by reason of liability to a third party." *See BVS Acquisition Co., LLC v. Brown*, 649 F. App'x 651, 654 (11th Cir. 2016) (citing *Royal Indem. Co. v. Knott*, 101 Fla. 1495 474, 479 (1931)). Absent "clear and unequivocal terms," a contract for indemnity does not cover expenses incurred as a result of the indemnified parties' own actions. *Id*. Here, the Indemnification Agreement includes such clear and unequivocal terms.

Agreement.

(Doc. 62-1, p. 1; *see id*. at 6 ("By executing this [Indemnity] Agreement [Defendants] are bound jointly, severally, and/or collectively to the [Plaintiff] with respect to all Bonds . . . to be executed, provided or procured by [Plaintiff] at any time in behalf of any of the [Defendants], and with respect to all undertakings of this [Indemnity] Agreement.").)

The Indemnity Agreement also required that Defendants pay for losses, costs, and expense incurred by Plaintiff after taking over Defendants' obligations under any agreement covered by a bond issued by Plaintiff:

> In the event of any breach, delay or default asserted [against Defendants] in connection with any Bond or any contract covered by the Bond . . . the [Plaintiff] shall have the right, but not the obligation, at its option and in its sole discretion, and is hereby authorized with or without exercising any other right or option conferred upon it by law or in the terms of this [Indemnity] Agreement, to take possession of any part or all of the work under any contract or contracts covered by any Bonds, and *at the expense of the [Defendants] to complete or arrange for the completion of the same, and the [Defendants] shall promptly upon demand pay to the [Plaintiff] all losses, costs, and expenses so incurred.*

(*Id*. at 3 (emphasis added).) Defendants' payments to Plaintiff under the Indemnity Agreement were to be made upon demand:

> Payment . . . shall be made to the [Plaintiff] by the [Defendants] *upon the demand by [Plaintiff] as soon as liability* exists or *is asserted against [Plaintiff]*, whether or not the [Plaintiff] shall have made any payment therefor. . . .
>
> The [Plaintiff's] demand shall be sufficient if sent by registered or certified mail, by facsimile transmission, or by personal service to the [Defendants] . . . .

(*Id*. (emphasis added).)

Finally, the Indemnity Agreement afforded Plaintiff the right to settle claims on any bonds issued by Plaintiff for Defendants:

> The [Plaintiff] shall have the right to adjust, settle or compromise any claim, demand, suit, arbitration proceeding or judgment upon the Bonds. The liability of the [Defendants] to the [Plaintiff] under this Agreement shall extend to and include all amounts paid by the [Plaintiff] under the belief that:
>
> (1)  the [Plaintiff] was or might be liable therefore; or
>
> (2)  such payments were necessary or advisable to protect any of the [Plaintiff's] rights or to avoid or lessen [Plaintiff's] liability or alleged liability.

(*Id*. at 4.)

## II.    The Performance Bond

As contemplated by the Indemnity Agreement, Plaintiff—as "**Surety**"—issued "Subcontract Performance Bond, number 211-69-64," which named BPDI as "Principal" and GLF Construction Corporation ("**GLF**") as "Obligee."[4] (*See* Doc. 69-1, p. 7 ("**Performance Bond**"); *see also* Doc. 19, ¶ 13; Doc. 62-2, pp. 1–12 ("**Tabor Aff.**").) Incorporating by reference the terms of a "written agreement" titled "Contract Number CN1-8-10-12-014A; Package 1, Upland and Minor Marine Works in connection with Canaveral Harbor 44 Foot Channel Project," ("**Subcontract**"),[5] the Performance Bond guaranteed BPDI's performance under the Subcontract:

---

[4] In Florida, the obligee on a bond has "the duty of fair dealing and good faith" toward the surety. *See Standard Accident Ins. Co. v. Bear*, 184 So. 97, 98 (Fla. 1938).

[5] Despite repeated references to the Subcontract in the parties' briefing and in the record evidence, neither party has provided the Court with a copy of the Subcontract.

Whenever Principal shall be, and be declared by Obligee to be in default under the [Subcontract,] the Obligee having performed Obligee's obligations thereunder:

> (1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein; or

> (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the [S]ubcontract subject to the provisions of paragraph 3 herein;

> (3) The balance of the [S]ubcontract price . . ., shall be credited against the reasonable cost of completing performance of the [S]ubcontract. . . [But] in no event shall the aggregate liability of the Surety exceed the amount of this [Performance Bond—**$3,563,741.76**]. . . .

(Doc. 69-1, p. 7; *see* Doc. 19, ¶ 12 (admitting that BPDI "entered into a subcontract agreement with [GLF], whereby [BPDI] agreed to perform certain work and/or supply materials" for a maritime construction project in the Canaveral Harbor ("**Project**").)

Defendants admit that GLF terminated the Subcontract shortly after it "declared BPDI to be in default under the Project." (*See* Doc. 19, ¶ 14; *see also* Doc. 69-1, pp. 12–13 ("**Subcontract Default Letter**"); Doc. 62-2, p. 52 ("**Subcontract Termination Letter**").) According to the Subcontract Default Letter, BPDI defaulted on the Subcontract by failing to: (1) remove material from the channel to a depth of 13 feet; (2) "correct, replace and/or re-excavate [BPDI's] faulty or defective [work]; and (3) "complete or diligently proceed with [BPDI's] work within the time required by [GLF]." (*See* Doc. 69-1, p. 12.)

In its response to GLF's Subcontract Default Letter, BPDI asserted that it did excavate the channel to 13 feet per the Subcontract, and it accused GLF of breaching the Subcontract by: (1) short paying BPDI for its diligent work; and (2) failing to dewater, supply rock, and give BPDI a "project schedule." (Doc. 69-1, pp. 14–16 ("**Default Responses**"); *see also id*. at 1–5 ("**Brewer Aff**.").) GLF denied BPDI's dewatering request and reiterated that BPDI had an obligation under the Subcontract "to present the project excavation to -13 to [GLF] and the Canaveral Port Authority." (*See id*. at 17–18 ("**Default Reply**").) Nonetheless, BPDI demanded that it be permitted to complete its work on the Project, which demand was refused "because GLF would not allow it or allow BPDI back on the work site." (*See* Brewer Aff., ¶ 15.)

GLF sent Plaintiff copies of the Subcontract Default and Termination Letters and it demanded that Plaintiff "undertake performance of the remaining Subcontract work and correct and complete same." (*See* Doc. 62-2, pp. 53–54 ("**Demand Letter**"); *see also* Tabor Aff., ¶¶ 4, 6, 7.) The Demand Letter further advised that "time was of the essence," and "due to [GLF's] obligations to mitigate its damages, GLF [would] continue to look to [Plaintiff] for all costs, expenses, and fees incurred should it become necessary to commence completion of the remaining work as a result of [Plaintiff's] inability to notify GLF of its decision." (*See* Doc. 62-2, pp. 53–54.)

## III. The Investigation

Plaintiff's employee Brandon Tabor "was primarily responsible for investigating, evaluating and attempting to resolve" GLF's claim on the Performance Bond. (*See* Tabor Aff., ¶¶ 2–4, 7; *see also* Brewer Aff., ¶ 6.) In communications between Messrs. Brewer and

Tabor, Mr. Brewer "rebutted the claim by GLF that [BPDI] had not reached a full thirteen (13) feet of material removal from the channel, which was a part of the [S]ubcontract . . ., by means of a contemporaneous survey of dredge depth that [BPDI] had prepared by a licensed surveyor" named Chris S. Bowers ("**Surveyor**").[6] (*See* Brewer Aff., ¶ 9.) Mr. Brewer also informed Mr. Tabor that:

> (1)　　"GLF's claim was invalid and . . . it had terminated the [S]ubcontract without just cause . . . [because] GLF was behind on its prime contract and was merely attempting to shift the blame for delay to [BPDI]" (*id.* ¶ 8);
>
> (2)　　"any claim of failing to maintain the dredge depth of thirteen (13) feet during the performance of the [S]ubcontract was not a contractual obligation" (*id.* ¶ 10); and
>
> (3)　　"any delay in performance of the [S]ubcontract was caused by GLF's failure to honor its obligations to provide rip rap rock and site dewatering, which were its obligation and which was the cause of [BPDI's] inability to work on the east side of the project as well as those areas requiring rock" (*id.* ¶ 12).

Although Mr. Tabor does not specifically address the foregoing in his affidavit, he does aver that he undertook his responsibilities concerning this matter "in good faith."

---

[6] Defendants filed a copy of the Survey with their Response along with averments from the Surveyor (Doc. 69-3, ¶ 5 ("**Surveyor Aff.**")) that: (1) the Surveyor prepared the Survey (*see id.* ¶ 5); (2) the data collected for the Survey "indicates that a -13 foot contour had been reached by the excavation effort performed by [BPDI]" (*id.* ¶ 6); (3) "[t]he vertical leveling procedures utilized in preparing said [S]urvey are consistent with the standards of my profession and meet typical accuracy requirements" (*id.* ¶ 7); and (4) "[t]he field work for said [S]urvey was performed over various intervals during the projects construction from December 16, 2014 thru May 6, 2015. During those dates it is my belief that the temporary benchmarks utilized for the machine calibrations were in place on the project site as shown and noted in my report" (*id.* ¶ 8.)

(*See* Tabor Aff. ¶ 8.) Specifically, Mr. Tabor: (1) "requested, obtained and considered documentation from GLF and [BPDI] pertinent to [BPDI's] work" under the Subcontract; (2) "retained a consultant, Philip Crannell [("**Consultant**")], to assist with the determination of whether [BPDI] had properly performed the work required under the [S]ubcontract;" and (3) "participated in various meetings with representatives of [BPDI] and of GLF." (*See id.*; *see also* Doc. 62-3 ("**Consultant Aff.**"); Brewer Aff. ¶ 13.)

Based on his investigation and input from the Consultant,[7] Mr. Tabor concluded that "GLF would have a likelihood of prevailing in an action against" Plaintiff on the Performance Bond, "and that it was reasonable and, indeed, urgent for [Plaintiff] to reach at least partial settlement of [GLF's claim] in order to minimize the exposure of [Plaintiff] and, derivatively, of [Plaintiff's] indemnitors to losses and expenses that would likely be associated with continued refusal to pay [GLF's] claim." (*See* Tabor Aff. ¶ 10.) Accordingly, Plaintiff "decided to make partial payment to GLF and to enter an [a]greement with GLF." (*See* Doc. 62-4, ¶ 6 ("**Thompson Aff.**")).

## IV. Settlement Agreement

Without "the knowledge or permission of [BPDI]," Plaintiff negotiated and entered into an agreement with GLF concerning Plaintiff's obligations under the

---

[7] After an investigation, the Consultant formed various opinions, including that: (1) the Subcontract required BPDI "to widen and deepen, by dredging or excavation, a certain portion of the entrance channel in Port Canaveral until that portion reached a uniform -13 feet consistently within" BPDI's area of the Project; (2) BPDI "did not achieve a uniform of -13 feet as required" by the Subcontract; (3) BPDI "failed to complete excavation work across the entire east to west ends of the Project;" and (4) BPDI did not take "steps to protect its work on the Project, which may have resulted in back wash into some of the excavated area." (*See* Consultant Aff., ¶¶ 5, 6.)

Performance Bond. (*See* Doc. 62-2, pp. 55–63 ("**Settlement Agreement**"); *see also* Tabor Aff., ¶ 11; Brewer Aff., ¶ 19.) Specifically, to "mitigate any costs and damages flowing" from BPDI's performance on the construction project ("**Project**"), Plaintiff agreed to pay GLF: (1) **$476,000.00** to cover costs that GLF represented it had "incurred and the estimate of the costs it will incur to complete [BPDI's] scope of work on the Project], less the Subcontract balance;" and (2) **$1,374,000.00** to cover the costs that GLF represented it would incur to pay a third party ("**Durta**") for 25 days of dredging work; and (3) additional funds for "work performed by Durta, and [GLF's hauling costs] beyond a total of 25 days if such additional work is not due to delays caused by [GLF] or Durta." (*See id*. at 56–58.)

Under the Settlement Agreement, Plaintiff and GLF acknowledged and explicitly declined to resolve BPDI and GLF's conflicting positions concerning the parties' respective obligations under the Subcontract ("**Disputes**"). (*See* Doc. 62-2, pp. 55–56.) In addition, GLF recognized and confirmed Plaintiff's "subrogation rights against [BPDI] to the extent of [Plaintiff's] payments" under the Settlement Agreement, and it agreed to "remit to [Plaintiff] any payments subsequently to be made by [GLF] to [BPDI] in connection with or arising out of the Project, including for payment of any judgment rendered in any action or adjudicative proceeding in favor of [BPDI] in connection with or arising out of the Project." (*See id*. at 57–58; *see also id*. at 60–61 (addressing Plaintiff's subrogation rights in relation to an action pending against GLF in state court—*Brewer Paving & Dev., Inc. v. GLF Const. Corp.*, No. 05-2015-CA-031758 ("**BPDI Action**")).)

## V.     Indemnification Demands

After receiving the Demand Letter, but before entering the Settlement Agreement, Plaintiff made a written demand that "the Defendants deposit $1,500,000 in collateral pursuant to the terms and conditions of the Indemnity Agreement." (*See* Doc. 19, ¶ 15; *see also* Doc. 62-2, pp. 40–41 ("**June Demand Letter**").) Defendants admit that they "refused to post the collateral demanded by [Plaintiff]." (Doc. 19, ¶ 16; Doc. 14, ¶ 16.) Nonetheless, on September 17, 2015, Plaintiff issued a check to GLF for **$1,850,000.00** ("**First Payment**") (*See* Doc. 62-2, p. 64; Tabor Aff., ¶ 12.) Three months later, Plaintiff issued another check to GLF for **$825,000.00** ("**Second Payment**"). (*See* Doc. 62-2, p. 65; Tabor Aff., ¶ 13.)

After entering the Settlement Agreement and making the First and Second Payments to GLF, Plaintiff again demanded that Defendants indemnify it and immediately deposit with Plaintiff collateral "in the full amount of **$2,842,463.00**, which [Plaintiff] has determined as its full potential exposure under the . . . Bonds." (*See* Doc. 19, ¶ 20; *see also* Doc. 62-2, pp. 46–47 ("**December Demand Letter**").) Defendants admit that they again refused to comply with the December Demand Letter. (*See* Doc. 19, ¶ 21.)

The Defendants' refusals to indemnify Plaintiff are grounded in their denial that BPDI breached the Subcontract and in Mr. Brewer's averments that: (1) all "payments made to GLF by [Plaintiff] in this matter were made without permission of [BPDI], and over the objection of [BPDI]" (Brewer Aff., ¶ 18); (2) the information that Plaintiff provided to BPDI concerning such payments was "incomplete, not itemized, and shows that work was being performed that was unnecessary and outside the terms and conditions" of the Subcontract (*see id*. ¶ 17); and (3) the amounts claimed by Plaintiff "far

exceed any of the work which was called for in" the Subcontract, and it is "approximately six (6) times greater tha[n] the balance due" to BPDI under the Subcontract. (*See id.* ¶ 18; *see also* Doc. 69-1, pp. 21–23.)

**DISCUSSION**

## I.      Liability

Plaintiff moves for summary judgment on the grounds that the evidence presents no genuine issues concerning the following material facts:

(1)      the parties executed the Indemnity Agreement;

(2)      in reliance on the Indemnity Agreement, Plaintiff issued the Performance Bond;

(3)      in its claim on the Performance Bond, GLF asserted "a substantial default" by BPDI and exposed Plaintiff "to exposure, not only for the claimed damages for the cost of completing or correcting the bonded work, but also for attorney's fees and consequential and extracontractual damages[;]"

(4)      in good faith performance of its obligations under the Performance Bond, Plaintiff incurred "[a]ctual losses and expenses and continuing liability for additional claims, all within the scope of the Defendants' indemnity obligations under the" Performance Bond; and

(5)      Defendants have refused to honor their obligations under the Indemnity Agreement to make payments to and deposit collateral with Plaintiff.

(*See* Doc. 62, p. 5.)[8]

---

[8] Plaintiff supported its Motion with the Tabor Aff., the Consultant Aff., and the Thompson Aff.

Although Defendants did not specifically address any of Plaintiff's "material facts," they nonetheless contend that the record evidence it filed with its Response shows "that genuine issues of material fact remain to be determined at trial." (Doc. 69, p. 2.)[9] Specifically, Defendants contend that the Brewer Aff. shows that: (1) Mr. Tabor "declined to take into account the [S]urvey . . . establishing the completion of the -13 foot dredge obligation . . . which was alleged to be part of the rationale of Plaintiff in determining that [BPDI] was in breach of [the Subcontract]" (*see id.* at 3); and (2) Plaintiff's investigation was inadequate (*see id.* at 5).

In its Reply, Plaintiff argues that Defendants' evidence is immaterial to Plaintiff's claims and is insufficient to raise a question of fact as to the Bad Faith Defense. (Doc. 70.) Upon consideration of the record and the applicable law, the Court agrees with Plaintiff and finds that the Motion is due to be granted as to Defendants' liability for breach of the Indemnity Agreement.

In Florida, a construction performance bond surety like Plaintiff is "entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed."[10] *Employers Ins. of Wausau v. Able Green, Inc.*, 749 F. Supp. 1100, 1103

---

[9] In support of its Response, Defendants filed the Brewer Aff., the Surveyor Aff., and the affidavit of Defendant Deborah Brewer (Doc. 69-2).

[10] The common law right of indemnity "is based on principles of equity." *Castle Const. Co. v. Huttig Sash & Door Co.*, 425 So. 2d 573, 574 (Fla. 2d DCA 1982). Common law indemnity "is allowed only where the indemnitor is solely at fault"—it shifts loss "from one who, although without active negligence or fault, has been obligated to pay, because of some vicarious or constructive liability, to another who should bear the costs because it was the latter's wrongdoing." *See id.* at 574–75. Plaintiff has not moved for summary

(S.D. Fla. 1990).[11] Further, where—as here—an indemnity agreement gives the surety discretion to settle a claim brought under a bond, "the only defense to indemnity for [such a] settlement is bad faith on the part of the surety." *See Travelers Cas. & Sur. Co. of Am. v. Grace & Naeem Uddin, Inc.*, No. 08-61868-CIV, 2009 WL 4110110, at *2 (S.D. Fla. Nov. 24, 2009).[12]

A bad faith defense is not available to indemnitees like Defendants who do not post collateral in accordance with a demand under an indemnification agreement. *See Fid. & Deposit Co. of Md. v. C.E. Hall Const., Inc.*, 627 F. App'x 793, 795–96 (11th Cir. 2015) (affirming order granting surety's motion for summary judgment against defendant on indemnification claims where surety settled bond claim in good faith after defendant failed to post collateral). When a bad faith defense is available, it requires proof of "an improper motive or dishonest purpose on the part of the surety." *See Auto-Owners Ins. Co. v. SE Floating Docks, Inc.*, 571 F.3d 1143, 1146, 1154 (11th Cir. 2009). Standing alone, evidence of a surety's "lack of diligence," negligence, and even "gross negligence," is not

---

judgment on its common law indemnity claim—Count III.

[11] *See also U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 888 (Fla. 2007) (noting that a surety on a construction bond is "entitled to indemnification" from the contractor); *Waterhouse v. McDevitt & Street Co.*, 387 So. 2d 470, 472 (Fla. 5th DCA 1980) (noting that surety had a contractual right to indemnification for "payments made in a good faith belief that they were necessary or expedient"); *Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp.*, 534 F. Supp. 2d 1290, 1307 (S.D. Fla. 2008) (noting that indemnification agreement gave a surety the "right to be exonerated and indemnified" when it "faces potential liability under" an issued bond).

[12] *See also Thurston v. Int'l Fid. Ins. Co.*, 528 So. 2d 128, 129 (Fla. 3d DCA 1988) (rejecting argument that the possibility of duplicate payments provides a defense to a surety's "right of indemnification"); *Aventura Eng'g*, 534 F. Supp. 2d at 1306 (noting that "right to settle" clauses provide sureties "with wide discretion in settling claims, even where the principal is not liable for the underlying claim").

evidence of bad faith. *W. Sur. Co. v. Merkury Corp.*, No. 12-22938-CIV, 2013 WL 12092472, at *7 (S.D. Fla. June 17, 2013) (noting that a surety's overstatement of required collateral was "not necessarily unreasonable" or evidence of bad faith), *adopted by* 2013 WL 12092089, at *1 (S.D. Fla. Aug. 21, 2013).

Here, Defendants argue that a jury could infer Plaintiff's bad faith from "the inadequacy of the Plaintiff's investigation combined with" the "self-interested" Settlement Agreement. (*See* Doc. 69, p. 5.) But, aside from rejecting the Survey and Defendants' representations in favor of the Consultant's views, Defendants do not identify any inadequacies in Plaintiff's investigation. Such disagreement with a surety's investigation "is not evidence of bad faith." *C.E. Hall Const., Inc.*, 627 F. App'x at 795–96 (affirming order granting surety's motion for summary judgment against defendant on indemnification claims).

The Court also rejects Defendants' argument that the Settlement Agreement reflects Plaintiff's improper motive and dishonest purpose because: (1) it obligates Plaintiff to pay GLF six times "the balance remaining on [the Subcontract]" (Doc. 69, p. 5); and (2) it put Plaintiff "in a position to recover its alleged damages from both the Defendants and [GLF] (*id*. at 6). First, there is simply no evidence of a financial incentive for Plaintiff to agree to pay "inflated payments" to GLF. Indeed, such payments reflect a loss to Plaintiff until and unless it can recover such sums from Defendants. *See TransAm. Ins. Co. v. H.V.A.C. Contractors, Inc.*, 857 F. Supp. 969, 974 n.8 (N.D. Ga. 1994) (rejecting argument that surety's payment of inflated bond claims evidenced bad faith, and granting surety's motion for summary judgment on its indemnification claim). Likewise,

the Settlement Agreement merely acknowledges Plaintiff's other avenues of recovery—it did not create a right to double recovery. *See J.S.U.B.*, 979 So. 2d at 890–91 (rejecting as speculative argument that indemnity would create a windfall for surety). Because Defendants have not shown that any genuine issue of material fact exists concerning their breach of the Indemnity Agreement or their Bad Faith Defense, the Motion is due to be granted as to Defendants' liability.

## II. Relief

In their Motion, Plaintiff contends that the Court should enter: (1) judgment against Defendants "in the amount of **$3,045,914.24** due to Defendants' breach" of the Indemnity Agreement; (2) "a final decree of specific performance, compelling Defendants to provide collateral to [Plaintiff] in the amount of **$3,946,815.50**;" and (3) a "final judgment . . . against all Defendants, jointly and severally." (*See* Doc. 62.)

Defendants do not dispute that if they are found liable under the Indemnity Agreement, then: (1) such liability would apply to all Defendants jointly and severally; and (2) specific performance is an appropriate remedy.[13] (*See* Doc. 69.) Defendants do

---

[13] With respect to specific performance, the Indemnity Agreement provides:

> [Defendants] acknowledge that the failure of [Defendants] to deposit with the [Plaintiff], immediately upon demand, the sum demanded by the [Plaintiff] as payment shall cause irreparable harm to the [Plaintiff] for which the [Plaintiff] has no adequate remedy at law. The [Defendants] agree that the [Plaintiff] *shall be entitled to injunctive relief for specific performance of any or all of the obligations of the [Defendants] under this [Indemnity] Agreement including the obligation to pay the [Plaintiff] the sum demanded and hereby waive any claims or defenses to the contrary.*

take issue with the adequacy of Plaintiff's damages evidence. Specifically, Mr. Brewer avers that:

> Despite [his] requests, [Mr.] Tabor has only provided [him] with sketchy information which he alleges is the basis of [Plaintiff's] payments to GLF. That information is incomplete, not itemized, and shows that work was being performed that was unnecessary and outside the terms and conditions of [the Subcontract]. [Plaintiff] has not provided any information from which to ascertain what work has been performed to complete the [Subcontract] and which work has been performed to complete GLF's prime contract with Canaveral Port Authority."

(Brewer Aff., ¶ 17.) Thus, the only remaining issue is whether Plaintiff has sufficiently established its damages.

Generally, a surety's "right to reimbursement for settlement payments is governed by a standard of good faith; whereas indemnification for fees and expenses is governed by a reasonableness standard." *Grace & Naeem Uddin*, 2009 WL 4110110, at *3; *see Am. S. Ins. Co. v. Nestor*, No. 16-23550-CIV, 2017 WL 2972841, at *5 (S.D. Fla. Jul. 12, 2017) (noting that claims for contractual indemnification of settlement payments require only a "showing of potential liability"). This general rule is consistent with the terms of the Indemnity Agreement,[14] which provides:

---

(Doc. 62-1, p. 2 (emphasis added).)

[14] The Indemnity Agreement also provides that when payment is demanded from Defendants: "The amount of such payment to the [Plaintiff] by the [Defendants] *shall be determined by the* [*Plaintiff*] . . . . (Doc. 62-1, pp. 1–2 (emphasis added).) This provision of the Indemnity Agreement suggests that Plaintiff may set the amount to be paid through specific performance, but it does not obviate the necessity for Plaintiff to prove its damages in a breach of contract action. *See Gray Ins. Co. v. Const. Mgmt. Assocs., LLC*, No. 6:13-cv-401-40KRS, 2014 WL 12628616, at *4 (M.D. Fla. Jul. 7, 2014) (noting that, under

the [Plaintiff] shall be entitled to charge for any and all disbursements made by the [Plaintiff] *in good faith* in and about the matters herein contemplated by this [Indemnity] Agreement under the belief that the [Plaintiff] is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient for the [Plaintiff] to make such disbursements, whether or not such liability, necessity or expediency existed . . . .

(Doc. 62-1, p. 2.) The Indemnity Agreement further indicates that an *accounting* is necessary "[i]n the event of any payment of any kind" by the Plaintiff, and in the event of an accounting "vouchers, invoices, and affidavit, or other evidence of any such payments made by the [Plaintiff] shall be prima facie evidence of the fact and amount of the [Defendants'] liability to the [Plaintiff]. (*See id*. (emphasis added).)

The record evidence does not suggest that an accounting has been conducted, and Plaintiff does not request that an accounting be ordered. Instead, in its Motion, Plaintiff requests that the Court simply enter judgment against Defendants in the amount of **$3,045,914.24** for Defendants' breach of the Indemnity Agreement ("**Present Damages**").[15] (Doc. 62, pp. 21–22, 24.) According to Plaintiff, the Present Damages consist

---

Florida law, an indemnitee must establish "damages" to recover for breach of an indemnity agreement); *see also Camp Dress & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1077 (Fla. 5th DCA 2003) ("In cases involving contractual indemnity, the terms of the agreement will determine whether the indemnitor is obligated to reimburse the indemnitee for a particular claim.").

[15] Plaintiff also contends that it expects to incur additional damages ("**Future Damages**") based on GLF's recent claims for: (1) "the remaining balance of [Dutra's] bills for performance of work on the [P]roject, which balance is represented by GLF to total at least **$834,265.30**," and (2) "GLF's hauling costs attributable to Dutra [for] work beyond 25 days on the Project, which costs are represented by GLF to total at least **$524,501.89**." (Tabor Aff., ¶ 14.) Plaintiff does not request that the Court enter judgment in these amounts, but it does include these Future Damages in calculating its collateral request.

of: (1) **$2,675,000.00** that Plaintiff paid to GLF for is claims under the Performance Bond ("**Paid Losses**"); (2) **$266,878.33** in costs and expenses ("**Claim Expenses**"); and (3) **$104,039.91** for the attorney fees incurred in this action ("**Litigation Expenses**"). (*Id.*) The Claim Expenses consist of:

(1) **$107,232.60** paid to the Consultant's firm ("**Consultant I Payment**");

(2) **$53,195.07** paid to consulting firm Chicago Bridge "for assistance with technical review of the [P]roject work and documents" ("**Consultant II Payment**");

(3) **$56,118.17** paid to the "law firm Thompson & Slagle, LLC" for its assistance with the Settlement Agreement and defense of GLF's claims ("**Attorney I Payment**");

(4) **$30,770.34** paid to the "law firm Becker and Poliakoff, PA for assistance with the defense of the [P]erformance [B]ond claim ("**Attorney II Payment**");

(5) **$6,337.50** for the costs of three mediations ("**Mediation Payment**"); and

(6) **$13,224.65** for Plaintiff's "[i]nternal costs" ("**Internal Costs**").

(Tabor Aff., ¶ 15.)

To support its claim for Paid Losses, Plaintiff submitted copies of checks issued to GLF in the total amount of **$2,675,000.00** (*see* Doc. 62-2, pp. 64–65), and the Tabor Aff., which states that the amounts paid to GLF reflected amounts that Plaintiff "was or might be liable for under the [P]erformance [B]ond . . . [or the amount] necessary or advisable in order to protect [Plaintiff's] rights or to avoid or lessen [Plaintiff's] liability or alleged liability." (Tabor Aff., ¶ 9.) Under the Indemnity Agreement, this evidence is prima facie

proof of Plaintiff's damages that Defendants have not successfully challenged. *See Nestor*, 2017 WL 2972841, at *5 (granting partial summary judgment on indemnitee's claim for settlement payments made when faced with potential liability under bond).

Plaintiff provides less evidence in support of its Claim Expenses. Indeed, with the exception of Mr. Tabor's conclusory averments, Plaintiff submitted no evidence — invoices, vouchers, or other evidence — concerning the Consultant II Payment, the Attorney I and II Payments, and the Mediation Payment.[16] (*See* Doc. 62.) Accordingly, the Court finds that the Plaintiff has not met its initial burden to establish that there is no genuine dispute as to the reasonableness and payment of the Claim Expenses. *See Gray Ins. Co.*, 2014 WL 12628616, at *6 (denying summary judgment where indemnitee failed to proffer prima facie evidence to support its "fees and costs" claim); *Grace & Naeem Uddin*, 2009 WL 4110110, at *2 (finding that surety failed to establish the "reasonableness" of its "claim for indemnification of attorney fees").

When a movant "fails to properly support an assertion of fact" in its summary judgment motion, the Court may "give an opportunity to properly support or address the fact" or "issue any other appropriate order." *See* Fed. R. Civ. P. 56(c). Here, the Court will enter summary judgment as to Plaintiff's liability, grant Plaintiff's request for specific

---

[16]In contrast, Mr. Tabor's averments concerning the Attorney III Payment are supported by the Thompson Aff. and redacted billing records of Plaintiff's attorneys in this action (*see* Doc. 62-4). According to the Thompson Aff., the total amount of expenses, fees, and costs incurred in the representation of [Plaintiff in this action" is no less than **$116,195.41**, based upon the amount billed to [Plaintiff] at this point (**$104,035.91**) plus time . . . not yet billed" — **$12,159.50** (*id.* ¶ 14). Mr. Tabor's averments concerning the Consultant I Payment are likewise supported by the Consultant's averment that he has "sent invoices to [Plaintiff] totaling **$107,232.60**" (*see* Consultant Aff., ¶ 7).

performance, but it will deny Plaintiff's request that the Court enter judgment against Defendants "in the amount of **$3,045,914.24**." Rather than proceed to trial on the issue of damages, the Court will: (1) require that the parties advise the Court whether it should order an accounting or additional summary judgment briefing on the damages issue; and (2) cancel the trial currently set to commence in the September Trial term.

CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Plaintiff's Motion for Summary Judgment (Dispositive Motion) and Memorandum of Law in Support (Doc. 62) is **GRANTED IN PART AND DENIED IN PART** in accordance with this Order.

2.   With respect to Defendants' liability for breach of the Indemnity Agreement (Count II), summary judgment is **ENTERED in favor of Plaintiff and against Defendants**.

3.   With respect to Plaintiff's claim for specific performance (Count I), summary judgment is **ENTERED in favor of Plaintiff and against Defendants**.

4.   On or before **September 1, 2017**, Plaintiff is **DIRECTED** to perform its obligations under the Indemnity Agreement by providing collateral to Plaintiff in the amount of $3,045,914.24.

5.    At the Pretrial Conference set for **August 23, 2017**, the parties are **DIRECTED** to advise the Court whether it should order an accounting or direct additional summary judgment briefing on the damages issue.

-22-

6. The trial currently set to commence in the September Trial term is **CANCELLED**.

7. General American Insurance Company's Motion in Limine (Doc. 76) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Orlando, Florida, this 17th day of August, 2017.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record